UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

ROGER ADKINS and
VIRGINIA LEE ADKINS
individually and as guardian
and next friend of
ROGER CHASE ADKINS, in infant,

      Plaintiffs

v.                                              CIVIL ACTION NO. 2:05-1172

ASPLUNDH TREE EXPERT CO.,
a foreign corporation,
AMERICAN ELECTRIC POWER
SERVICE COMPANY, a foreign
corporation, and
JOHN DOES 1 THROUGH 30,

      Defendants

<u>MEMORANDUM OPINION AND ORDER</u>

      Pending is defendants' motion for summary judgment,
filed October 10, 2007.


I.


      On June 23, 2004, plaintiff Roger Adkins ("Mr. Adkins")
and his eight year-old son, Roger Chase Adkins ("Chase"), were
traveling to Mr. Adkins' workplace at approximately 1:30 p.m.
(Dep. of Roger Adkins at 25-26).  It was a clear day.  (<u>Id.</u> at
28).  Mr. Adkins and Chase were traveling southbound on the
Delbarton side of Buffalo Mountain on United States Route 52

("Route 52").  (Compl. ¶ 8).  Mr. Adkins travels the two-lane
Route 52 on a daily basis.  (Adkins Dep. at 28).

        In an area of Route 52 where the speed limit drops to
25 miles per hour, (id. at 30), Mr. Adkins encountered a truck
owned by defendant Asplundh Tree Expert Company ("Asplundh") that
was parked off the right-hand side of the road.  (Id. at 30-31).
Two Asplundh employees were standing outside the truck.  (Id. at
31).  As Mr. Adkins passed the two employees, he encountered
another Asplundh employee, a flagman, in Mr. Adkins' lane of
travel approximately 500 feet from his fellow employees. (Id. at
35).  The flagman held a sign with the word "SLOW" emblazoned on
it in an attempt to ease the speed of oncoming motorists.  (Id.
at 33).  Mr. Adkins was entering the first curve in the road when
he saw the flagman.[1]  (Id. at 34).  The flagman directed Mr.

_____

        [1]On November 2, 2007, the court conducted the pretrial
conference.  Counsel were directed to submit graphical depictions
and accompanying affidavits designed to illuminate the parties'
respective accounts of the accident scene and the adjacent area.
On November 7 and 6, 2007, respectively, plaintiffs and
defendants filed their submissions.  Plaintiffs' submission is a
map of the area obtained from the Google™ website.  The
submission lacks both scale information and adequate orientation.
Defendants' original submission was a grainy aerial image.  The
court directed defendants to submit a better depiction, which was
received November 14, 2007.  The revised submission contains few
annotations.  Inasmuch as the court is obliged to view the
evidence and any resultant inferences in the light most favorable
to plaintiffs, the November 7, 2007, submission by the plaintifs
is of dominant importance for purposes of considering defendants'

2

Adkins into the other lane ("left-hand lane").  (Id. at 35).  Mr.
Adkins contended at his deposition that he had difficulty
recalling anything else about the Asplundh employees or what
transpired next.  (Id. at 32).

There are a number of curves in the portion of Route 52
that Mr. Adkins was traveling.  (Id. at 35).  After leaving the
first curve where he saw the flagman, Mr. Adkins entered a second
curve. (Id.)  While, as noted, his recollection is hazy, he
appears to contend that he stayed in the left-hand lane thinking
he would encounter another flagman further up the road.  (Id. at
36).  Instead, it appears that upon exiting the second curve, he
lost control of his vehicle, traveled from the left-hand lane to
the right-hand lane, proceeded down a 200 foot embankment, and
came to rest in the yard of the Hall residence.  (Id. at 34, dep.
ex. A at 5).

The next thing Mr. Adkins remembers is the Halls'

_____

motion.
    The body of this memorandum opinion reflects the witness
testimony and affidavits submitted with the summary judgment
briefing.  Any variances from these testimonial accounts
appearing in the November 7, 2007, graphical depiction will be
addressed by footnotes.  The first variance appears at this
juncture, inasmuch as plaintiffs' graphical depiction reflects
the flagman in the middle of the first curve instead of the entry
point to that initial bend in the road as explained in Mr.
Adkins' deposition testimony.

neighbor, Lois Moore, yelling at him and stating that they had to move him.  (Adkins Dep. at 40, 42).  Mr. Adkins learned later that he had been thrown from his vehicle during the accident.  (Id. at 41).  While he again has difficulty recollecting details, he believes the two Asplundh employees that he saw prior to the flagman were approximately 1,000 feet away from where the accident occurred.  (Id. at 33).

Mr. Hall helped move Mr. Adkins from the vicinity of the vehicle.  (Id. at 43).  Mr. Hall then called Mr. Adkins' parents at his request.  (Id. at 45).  Mr. Adkins' mother advised Mr. Adkins that on the way up to the top of the hill in the ambulance, presumably to access Route 52, she saw an Asplundh truck at a bar close to where the accident happened with "a bunch of people standing around it . . . ."[2]  (Id. at 31, 48).  Chase was taken to the hospital by Mr. Adkins' sister, Miranda White.  (Id. at 54-55).

A police report taken at the time of the accident by Delbarton Police Officer Chris Dingess lists a distraction inside the vehicle as occurring prior to the accident.  (Id. at 39, 56).  Mr. Adkins denies speaking with Officer Dingess at the scene and

---

[2]Defendants' graphical description places a "closed business establishment[,]" presumably the bar seen by Mr. Adkins' mother, .6 miles from the accident site.

4

has no explanation why that notation would appear in the report. (<u>Id.</u> at 39, 57).  He professes there was no such distraction. (<u>Id.</u>).

Mr. Adkins testified that he saw Officer Dingess eighteen months after the accident.  (<u>Id.</u> at 64).  Mr. Adkins recounted the  following exchange between the two:

> I just pulled in and I asked him, I talked to him, I said, "It still bothers me what happened at the accident."  I said, "Can you tell me what happened?" He said that there were debris in the road where I went over the mountain.

(<u>Id.</u>)

Mr. Adkins was airlifted to Cabell-Huntington Hospital and spent seven days recuperating from injuries to his neck, arms back, and hip, along with various lacerations and abrasions. (<u>Id.</u> at 83, 84).  He did not return to work until the end of February 2005.  (<u>Id.</u> at 82).  Chase suffered a broken arm and various lacerations and abrasions.  (<u>Id.</u> at 99).

In his response brief, Mr. Adkins attributes his memory failure to the trauma he suffered in the accident. (Pl.'s Resp. at 2).  He identifies four other fact witnesses, however, in an

attempt to fill the gaps in the record.[3]  First, Ted Warden
happened upon the scene only minutes after the accident.  In an
affidavit, Mr. Warden describes what he observed:

> I was talking to Chris Dingess, a police officer, at
> the intersection of Route 65 and 52 at the foot of
> Buffalo Mountain, getting ready to leave and go toward
> Williamson when the officer received a call that a
> vehicle had went over the hill by the Moore's
> residence.  Chris pulled out and went up the hill in a
> northerly direction on U.S. 52 and I followed after
> him.  Chris pulled off at road which went down to the
> Moore residence.  I saw the wreck and people gathered
> around it and I proceeded on up the hill.  When I
> rounded the curve at the scene of the accident there
> were two guys pulling tree limbs out of the road.  They
> threw the tree limbs in the back of an orange Asplundh
> truck.  The truck had a chipper attached to the back of
> it.  They proceeded on up the hill once all the guys
> were in the truck.  I followed after them on U.S. 52
> traveling north, until they turned off on the second
> mountain at AEP's office.  I went on to Williamson and
> continued with my business.  On the way back to
> Delbarton, I saw the tracks of the vehicle that went
> over the hill, and I realized the wreck had started
> there at the scene were [sic] the Asplundh truck had
> been.  There were marks on the road, in the gravel near

_____

[3]Plaintiffs' November 7, 2007, submission contains a
November 6, 2007, affidavit from a fifth individual, Robert
Adkins ("Mr. Adkins' father").  Mr. Adkins' father asserts that
on his way to the accident scene with his wife, he passed an
Asplundh truck and noticed leaves and debris in the road.  He
additionally states as follows:

> I stopped & [sic] asked the tree company personnel
> if they knew where a wreck was on the mountain.

> They said yes [sic] the second curve down on [sic]
> right.

(Aff. of Robert Adkins).

> the guardrail.  I could clearly see this is where the
> guy who went over the hill had left the road.    I
> looked for Chris Dingess to tell him I thought I knew
> why the guy had run over the hill but Chris was already
> off duty and I was informed he would be off for the
> next two days.  The next time I saw him I told him
> about the guys and the tree limbs being right were
> [sic] the guy ran off the road.  They had no flags,
> flagmen, and no signs.  I had to hit my brakes hard
> when rounding the curve to keep from hitting them.
> Chris told me then he would come up and get a
> statement.  But Chris obtained employment in Logan and
> never contacted me for my statement.

(Aff. of Ted Warden at 1).  During his deposition, Mr. Warden

testified that he saw an Asplundh truck in the vicinity of the

accident.  (Dep. of Ted Warden at 20).  Mr. Warden additionally

stated that he saw two to three branches, an inch and a half in

diameter, in the southbound lane of the road, with other branches

having been placed in the Asplundh truck.  (Id. at 23).

          Second, John Robert Ramey, a real estate developer,

testified that while he has never met the plaintiffs, he "almost

hit those trees" while going southbound on Route 52.  (Id. at 17,

13).  When he looked in his rearview mirror after passing the

debris, he "saw a burnt orange truck, which looked like the

Asplundh trucks."[4]  (Id. at 38).  He also recalled a conversation

_____

          [4]Plaintiffs' November 7, 2007, submission includes an
affidavit from private investigator Danny Lane.  Mr. Lane's
affidavit reflects that "John Ramey state [sic] he saw a [sic]
orange ASPLUPH [sic] truck sitting at the entrance of Moore Lane
                                        (continued...)

7

he had with his wife after arriving home the day of the accident:

> When I went home I told my wife, I said . . . 'they're
> cutting trees up there and they've got the trees laying
> out in the road.  There's nobody out there.'  And I
> said, 'I come around the curve and there they were, and
> I swerved to the left and had there been anybody coming
> I would have had a head-on collision.'  I just thank
> the Lord there wasn't nobody coming.

(Id. at 21).

Upon hearing some men discussing the accident the next day, Ramey thought to himself "'Well, it could have been me,' because I went to the left and apparently he went to the right." (Id.)  Mr. Ramey recalled that there "could have been 100" trees or branches covering the southbound lane of Route 52 when he traveled through the area.  (Id. at 30, 34, 36 (stating additionally "These were big, big, big branches and they were big enough to tear up your vehicle.").  He additionally noted that the "road is . . . crooked" in the area where the accident occurred.  (Id. at 32, 34) ("stating "it's one curve after another going in and out.").

Third, Roger Dale Adkins ("Dale Adkins"), Mr. Adkins'

---

[4](...continued)
three tenths of a mile down hill from the pull off point [where Mr. Adkins saw the Asplundh truck prior to the accident] just after the accident.  (Aff. of Danny Lane ¶ 12).  Mr. Ramey's November 6, 2007, affidavit is consistent with Lane's representation.

uncle, testified concerning debris he likewise encountered on Route 52 the day of the accident upon returning from a trip to Kentucky:

> [T]here was tree limbs everywhere, and they was trying to clean it up, two young boys.  And they was running this and that.  But I had to go real slow [5-10 miles per hour] to keep from sliding on them.
>
>           . . . .
>
>      The whole ground was covered with them. . . . And my little car, it even slid on them, you know, and they kept saying, 'slow down,' you know, but they didn't have no flagman or anything. . . . These two guys was out there picking up all this wood.

(Id. at 29, 32, 35).

Dale Adkins recalled that there were 40-50 limbs occupying both lanes of Route 52, the larger among them approximating the diameter of a soft drink can.  (Id. at 33-34). Prior to encountering the limbs, and the two men motioning him to slow down, Dale Adkins had been traveling 34-40 miles per hour. (Id. at 36).  He indicated that the two men gathering the branches were associated with another group of four to six men gathered around an Asplundh truck that was approximately a quarter mile away.  (Id. at 37-38).  He had passed the truck prior to encountering the debris.  (Id.).  He provided a further description of the scene as follows:

> They cut it all, you know, and just let it -- Not big

9

trees.  They was just, you know, like growing out and -
- Well, they just sawed them off, I guess.  But, now,
it was all over the road.

          . . . .

And so after he got better and stuff I told him I went
across that mountain and them limbs and everything was
in the road.  And that's right where he went over.

(Id. at 40, 48).  Dale Adkins additionally observed the length of

the roadway obstructed by the branches could have been as much as

an eighth of a mile.  (Id. at 42).


        Fourth, the record as it existed prior to the November

6 and 7, 2007, submissions, includes another affidavit from

private investigator Danny Lane, who recounts a conversation with

Ms. Moore:

Ms. Moore states that there were 3 men in a white truck
the day of or day before that came into her residential
area, took out power saws and cut down tree limbs from
the power lines.  They also cut down a complete tree
and left it.  She does not know for sure if they were
from American Electric Power or the tree cutting
service that had been working in the area on the road
above.

(Aff. of Danny Lane ¶ 6).


        On December 1, 2005, plaintiffs instituted this action

in the Circuit Court of Mingo County.  They alleged negligence

and loss of consortium claims against Asplundh and seek

compensatory and punitive damages.  On June 14, 2006, plaintiffs

10

instituted another action in that same court alleging the same
claims but with respect to both Asplundh and the newly added
defendant, American Electric Power Service Company ("AEP").
Defendants removed these two actions respectively on December 21,
2005, and July 12, 2006.  On October 19, 2006, at the parties'
request, the court consolidated the two actions.

Defendants now move for summary judgment, asserting (1)
there is no evidence Asplundh or AEP breached any duty or
proximately caused plaintiffs' damages, and (2) plaintiffs are
not entitled to punitive damages in any event.

II.

A.   Governing Standard

A party is entitled to summary judgment "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Material facts are those necessary to
establish the elements of a party's cause of action.  <u>Anderson v.</u>

11

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); Id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts    . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

B.   Discussion

1. Negligence and Proximate Cause

The Supreme Court of Appeals of West Virginia has adopted the following partial formulation respecting a plaintiff's burden of proof in a negligence action: "'Negligence is the violation of the duty of taking care under the given circumstances. It is not absolute, but is always relative to some circumstance of time, place, manner, or person.'"  Syl. pt. 7, <u>Strahin v. Cleavenger</u>, 216 W. Va. 175, 179, 603 S.E.2d 197, 201 (2004) (quoting syl. pt. 1, <u>Dicken v. Liverpool Salt & Coal Co.</u>,

13

41 W. Va. 511, 23 S.E. 582 (1895)).

It is equally well-settled that "Questions of negligence . . . present issues of fact for jury determination where the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them." Id. syl. pt. 10 (quoting syl. pt. 1, Ratlief v. Yokum, 167 W. Va. 779, 280 S.E.2d 584 (1981); syl. pt. 5, Hatten v. Mason Realty Co., 148 W. Va. 380, 135 S.E.2d 236 (1964); syl pt. 6, McAllister v. Weirton Hosp. Co., 173 W. Va. 75, 312 S.E.2d 738 (1983); syl. pt. 17, Anderson v. Moulder, 183 W. Va. 77, 394 S.E.2d 61 (1990); syl. pt. 1, Waugh v. Traxler, 186 W. Va. 355, 412 S.E.2d 756 (1991); syl. pt. 2, in part, Johnson v. Mays, 191 W. Va. 628, 447 S.E.2d 563 (1994)).

Plaintiffs rely on West Virginia Code section 17-16-1, prescribing as a public nuisance the obstruction of roads and highways by placement thereon of cut or fallen trees or limbs. Plaintiffs contend that the defendants' alleged violation of this statute constitutes prima facie proof of negligence.

West Virginia Code section 55-7-9 provides as follows:

> Any person injured by the violation of any statute may recover from the offender such damages as he may sustain by reason of the violation, although a penalty or forfeiture for such violation be thereby imposed, unless the same be expressly mentioned to be in lieu of such damages.

14

_Id._

          Consistent with section 55-7-9, syllabus point 3 of

_Kizer v. Harper_, 211 W. Va. 47, 561 S.E.2d 368 (2001), provides

pertinently as follows:

> 3. "Violation of a statute is prima facie evidence of
> negligence. In order to be actionable, such violation
> must be the proximate cause of the plaintiff's injury."
> Syl. Pt. 1, _Anderson v. Moulder_, 183 W. Va. 77, 394
> S.E.2d 61 (1990).

_Id._ at 49, 561 S.E.2d at 370.  The body of the _Kizer_ opinion

provides additionally as follows:

> While a statutory violation gives rise to a prima facie
> case of negligence, "'the determination as to whether
> there was in fact a violation and whether the violation
> was the proximate cause of the injury is within the
> province of the jury.' Syllabus Point 3, _Simmons v._
> _City of Bluefield_, [159] W. Va. [451], 225 S.E.2d 202,
> 88 A.L.R.3d 105 (1975)." Syllabus Point 3, in part,
> _Jones v. Two Rivers Ford, Inc._, 171 W. Va. 561, 301
> S.E.2d 192 (1983).

_Id._ at 53, 561 S.E.2d at 374 (quoting _Anderson_, 183 W. Va. at 90,

394 S.E.2d at 74).

          As one might gather from the preceding quotation, a

statutory violation does not result in a finding of negligence as

a matter of law in West Virginia.  _See_, _e.g._, _Spurlin v. Nardo_,

145 W. Va. 408, 415, 114 S.E.2d 913, 918 (1960) ("Notwithstanding

some inconsistent statements in other West Virginia cases, the

law in this state is now settled that the violation of a statute

15

is prima facie negligence and not negligence per se.").  Instead,
the proximate cause requirement, along with the principle that
""[o]nly a rebuttable prima facie presumption of negligence
arises on a showing that the statute was violated[,]" both
essentially reserve the question of liability to the fact finder.
Waugh v. Traxler, 186 W. Va. 355, 358, 412 S.E.2d 756, 759 (1991)
(quoting Anderson, 183 W. Va. at 79, 394 S.E.2d at 63); see also
Pickett v. Taylor, 178 W. Va. 805, 364 S.E.2d 818 (1987); Syl.
pt. 3, Oldfield v. Woodall, 113 W. Va. 35, 166 S.E. 691 (1932)).

          Once the violation of a safety statute is demonstrated,
the burden shifts to the defendant to produce "evidence tending
to show that the . . . [violator] did what might reasonably have
been expected of a person of ordinary prudence, acting under
similar circumstances, who desired to comply with the law."
Waugh, 186 W. Va. at 359, 412 S.E.2d at 760; see also Gillingham
v. Stephenson, 209 W. Va. 741, 746, 551 S.E.2d 663, 668 (2001).

          Section 17-16-1, the statute relied upon by plaintiffs
to establish prima facie negligence, provides pertinently as
follows:

     Obstructions, within the meaning of this chapter, shall
     include trees which have been cut or have fallen either
     on adjacent land or within the bounds of a public road
     in such a manner as to interfere with travel thereon;
     limbs of trees which have fallen within a public road.
     . . so as to interfere with travel thereon . . . wood

16

> or logs piled within the bounds of a public road;  . .
> . or any other thing which will prevent the easy, safe
> and convenient use of such public road for public
> travel. Such obstructions shall be considered within
> the bounds of any state or county-district road
> whenever any part thereof shall occupy any part of the
> right of way provided by law or acquired for road
> purposes, not including the additional land acquired
> for slopes, cuts or fills.
>
> Such obstructions so placed and left within the limits
> of such road are hereby declared to be public
> nuisances, and, in addition to other remedies provided
> in this chapter, the county court or the state road
> commission, as the case may be, may apply to the
> circuit court, or other court of competent jurisdiction
> of the county in which they may be, for an injunction
> to abate such nuisance.

Id. Defendants contend "no part of . . . article [16] purports

to proscribe utility companies or their contractors from

temporarily trimming branches next to or into a roadway and then

removing them, all while directing traffic around and through

such work."  (Defs. Memo. in Supp. at 6).  Even if that be deemed

a proper reading of the statutes, there remains the question,

inter alia, of whether the defendants, or either of them, failed

to direct traffic around and through the alleged work.

       The general admonition found at the end of section 17-

16-1 is particularly noteworthy:

> obstructions . . . left within the limits of such road
> are hereby declared to be public nuisances, and, in
> addition to other remedies provided in this chapter,
> the county court or the state road commission, as the
> case may be, may apply to the circuit court, or other
> court of competent jurisdiction of the county in which
> they may be, for an injunction to abate such nuisance.

17

W. Va. Code § 17-16-1 (emphasis supplied).  Inasmuch as section 17-16-1 is aimed toward ensuring the safety of public ways, the underscored language is properly understood to prohibit any person, not simply land owners, occupants, and specifically named corporate entities, from placing and leaving obstructions on state roads.  See, e.g., W. Va. Code 17-1-3 ("The Legislature finds that . . . [public highways that run over the surface of the state] . . . are essential to . . . development . . . and that the health and safety of each of the citizens of this state are affected daily by the availability of each of these three types of public highways"); Lee-Norse Co. v. Rutledge, 170 W. Va. 162, 166, 291 S.E.2d 477, 481 (1982) (quoting Sutherland authority and Davis v. Hix, 140 W. Va. 398, 420, 84 S.E.2d 404, 417 (1954)) ("'Upon this question, the following quotations are from Vol. II, Lewis' Sutherland Statutory Construction, Second Edition: Sec. 582: "The law favors a liberal construction of certain statutes to give them the most beneficial operation. * * * Two classes of statutes are liberally construed -- remedial statutes, and statutes which concern the public good or the general welfare." . . . Sec. 590: "Where the intent of the act is manifest, particular words may have an effect quite beyond their natural signification in aid of that intent."'").

18

Based upon this interpretation of section 17-16-1, plaintiffs may attempt to prove a violation of the statute's terms and, if successful, rely upon the infraction to establish the presumption of a duty breached.  Defendants would then be permitted to rebut the presumption by showing their actions were in accordance with what might reasonably have been expected of persons of ordinary prudence, acting under similar circumstances, who desired to comply with the law.

Having clarified the parties' respective burdens and the effect of section 17-16-1, the court turns to an examination of the evidentiary record.  Viewed in the light most favorable to the plaintiffs, the summary judgment record reflects that Mr. Adkins, his mother and father, Dale Adkins, Mr. Warden, and Mr. Ramey saw an Asplundh vehicle at different locations near the scene of the accident.  Some of those same individuals also saw Asplundh employees in the vicinity of the accident, at times picking up tree limbs, which Mr. Warden, Dale Adkins and Mr. Ramey saw on the road in the vicinity of the accident.  Dale Adkins observed that an eighth of a mile, perhaps hundreds of feet, of the roadway was obstructed by the branches.

Additionally, Mr. Ramey's and Dale Adkins' testimony suggests the limbs constituted a hazard that had the potential,

19

respectively, to damage a vehicle or cause it to slide. This direct and circumstantial evidence, along with its accompanying inferences, is sufficient to raise a genuine issue of material fact on both liability and causation as to Asplundh liability in negligence. See syl. pt. 6, Brady v. Deals on Wheels, Inc., 208 W. Va. 636, 638, 542 S.E.2d 457, 459 (2000) ("'The burden is upon the plaintiff to establish a prima facie case of negligence against the defendant in order to warrant jury consideration but such showing may be made by circumstantial as well as direct evidence.'")(quoted authority omitted); Smith v. Edward M. Rude Carrier Corp., 151 W. Va. 322, 332, 151 S.E.2d 738, 744 (1966) ("Where credible circumstantial evidence establishes a prima facie case of negligence a jury question exists and it is for the jury to determine whether it is sufficient to overcome direct testimony to the contrary.").

Respecting AEP, however, the evidentiary record is negligible. Mr. Warden followed an Asplundh vehicle until it "turned off on the second mountain at AEP's office." (Aff. of Ted Warden at 1). Aside from this opaque observation, the only other basis for imposing liability on AEP is Ms. Moore's speculative, hearsay suggestion that she saw men in a white truck, the day of or day prior to the accident, who cut down tree limbs from

20

certain power lines in the area.  Plaintiffs' meager showing
respecting AEP is insufficient to raise a genuine issue of
material fact.  AEP is, accordingly, entitled to dismissal.


### 2.  Punitive Damages


The supreme court of appeals has observed that review
of a punitive damages award is based upon the following "two-step
paradigm[:]"

> "[F]irst, a determination [must be made concerning] . .
> . whether the conduct of an actor toward another person
> entitles that person to a punitive damage award under
> Mayer v. Frobe, 40 W. Va. 246, 22 S. E. 58 (1895);
> second, if a punitive damage award is justified, then a
> review is mandated to determine if the punitive damage
> award is excessive under Garnes v. Fleming Landfill,
> Inc., 186 W.Va. 656, 413 S.E.2d 897 (1991)."

Syl. pt. 9, Bowyer v. Hi-Lad, Inc., 216 W. Va. 634, 609 S.E.2d
895 (2004) (quoting Syl. pt. 7, Alkire v. First Nat. Bank of
Parsons, 197 W. Va. 122, 475 S.E.2d 122 (1996)).  By analogy,
then, the imposition of punitive damages is likewise a two-step
process, namely, whether the conduct of an actor warrants a
punitive award and, if so, in what amount.

Regarding the first step, Mayer teaches that a punitive
award must be based upon a finding that the wrongdoer's actions
amounted to "gross fraud, malice, oppression, or wanton, willful,
or reckless conduct or criminal indifference to civil obligations

21

affecting the rights of others."  <u>See</u> syl. pt. 4, in part, <u>Mayer v. Frobe</u>, 40 W. Va. 246, 246, 22 S. E. 58, 58 (1895) (emphasis supplied).

Asplundh contends that "under no set of circumstances could . . . [plaintiffs'] allegations . . . that Defendants failed to warn them about a truck or some branches in the road . . . be transmuted into 'gross fraud, malice, oppression, or wanton, willful, or reckless conduct . . . .'"  (Defs.' Memo. in Supp. at 15).

Viewed from the plaintiffs' perspective, the evidence and inferences suggest that Asplundh (1) blocked a substantial portion of a well-traveled public way with 40 to 50 large tree limbs, (2) provided inadequate warning of the hazard, and (3) then left the scene knowing that an accident had occurred.  Under these circumstances, summary judgment is inappropriate on the punitive damages request.

III.

Based upon the foregoing, the court ORDERS that defendants' motion for summary judgment be, and it hereby is, granted with respect to plaintiffs' claims against AEP and denied as to its residue.

22

The Clerk is directed to forward copies of this opinion and order to all counsel of record.

DATED: January 23, 2008

John T. Copenhaver, Jr.
United States District Judge